The issue that this court has to decide in this appeal is whether or not two in-court The way we get to that issue is as follows. The appellant was charged with robbing the bank. He was charged with robbing the Wood Forest National Bank on December 11, 2013. The bank was robbed by a black male. The day after the robbery, the shirt, the still photographs, the DNA evidence, all of this other evidence, what do we do with that? I'm going to get to that, Judge. But before I get to that, Judge, I believe I need to explain how this issue arose. We know how it arose. And the government has essentially conceded error. Well, not just essentially. They've conceded error. But they say it's harmless because there's so much other evidence, which is Judge Owen's question. So it seems to me it would be best for you to focus in on that, since you've already sort of won on the main point, which is, was there error? Yes. Now, the government has to show it's harmless error beyond a reasonable doubt. That's a high standard, so it would seem to be helpful to you to focus on that. The way we decide whether or not this was harmless error is we look at the inadmissible evidence, the effect that that evidence had on the other evidence that was induced at trial, the effect that it had on the other evidence, all the evidence that you just mentioned, and we also look at the effect that it had on the conduct of the defense. Those are the two things we have to look at. And then we have to decide, if we take that out of the picture, does the remaining evidence, is it sufficient to not only sustain the verdict, but is it so overwhelming that it establishes the guilt of the defendant beyond a reasonable doubt? Now, I'd like to turn first to the effect that the in-court identifications, the effect that that had on the conduct of the defense. Now, the defense tried to present two lines of defense. One was the general identification, who committed this robbery. The other one was that an individual by the name of Trevion Robinson was the person that committed the robbery. And the way that he put that out, the trial counsel put that out before the jury in opening statement, was he told them that the question is, who did it? He told them that they were going to hear about an individual by the name of Trevion Robinson, that this bank robbery was committed by someone driving Mr. Trevion Robinson's vehicle, a black Honda, that it was committed by someone wearing a shirt that belonged to Trevion Robinson, a pair of sweatpants belonging to Trevion Robinson, committed by a gun belonging to Trevion Robinson. In opening statement, he also told them that when the police officers went to Trevion Robinson's house in his bedroom, they found the shirt that was used to commit the robbery. They found the sweatpants that was used to commit the robbery. Let me ask a couple of things because I think that defense counsel's strategy of trying to blame Robinson is a sensible one and a good one. My first question about the facts is everybody says that the reason why Robinson can't be the guy and wasn't suspected is he's too different of a build. I put that in quotes from the guy in the video or in the surveillance video or the security video. My question is how can Schaefer be wearing Robinson's clothes if their builds are so different that they couldn't be the same guy? I mean if my build is like super different from Judge Prado, I can't wear his clothes. So that doesn't make any sense to me. Well, and I would agree that- So were they similar enough that they could wear each other's clothes? I've never- Because it's not just Robinson's clothes that committed the robbery. It's just who was in them, right? That's a good question to ask the trial counsel. I've never seen this. Was the video shown to the jury? Yes, Your Honor. Okay, so the jury could determine whether it was Mr. Robinson or Mr. Schaefer in looking at it? No, Judge. I would disagree with that. The video is not clear enough for you to make a positive identification of who committed the robbery. It's- What about the fingerprints on the deposit slip that he held up? The fingerprint was-it was not a regular fingerprint. It was a fingertip print, just the tip of the finger. And with regard to that piece of evidence, we have one officer testifying that in order to make an identification, you have to have a certain number of minutia points in order to make a comparison. And then the other, Detective Farley, she testified, well, no, you don't have to have a certain number of minutia points in order to make a comparison. So that evidence wasn't the overwhelming evidence that the government was suggesting. Yeah, but see, that's the problem that I have. I went and looked at that because, to me, the only thing that can't be pinned on Robinson, you can pin the clothes, you can pin the DNA's inconclusive, blah, blah, blah. You can pin everything on Robinson except the fingerprint. And so I was looking for y'all to have an expert or there to be some really searing cross about how can you make this comparison and let's look at the cards and all of that. And it's not here. I looked every time the word fingerprint was met in the transcript, and it's really very general. I mean, there's an argument made in the closing argument about, well, we don't know what the minutiae were, we don't really have the card, but there's very little here to undercut the fingerprint. And fingerprints are huge with a jury. And so it seems to me that that's the thing you have to show us, that the fingerprint is not huge, such that we can accept that the identification then looms larger. Well, I believe that it was not. This is not a sufficiency of the evidence case because if it were, the fingerprint would be enough to get you. No, no, and I'm not saying that. What I'm saying is when we look at harmless there or beyond a reasonable doubt, one of the questions you look at is was the evidence so overwhelming. You know, we admitted Mr. X, but there were 10 other witnesses who said the same thing, Mr. X is then harmless. So here Mr. X is, these two identifications. So we look at all the other evidence, and what I'm saying is most of the other evidence you can pin on Robinson, at least arguably, but you can't do that with the fingerprint. So does that weigh down that bucket so heavily that we do have harmless there or beyond a reasonable doubt? And if not, why? That's my question. I would argue absolutely not. I don't believe that a jury would convict someone solely on a fingertip print. Now, getting back to what I was stating earlier, when we try to assess the effect that these in-court identifications had upon the conduct of the defense, what we see, we can assess the harm that came from those in-court identifications. When we look at the use that was made of it by the government in the closing arguments, they said in the closing argument, the government said, but what really convicts him and should convince you is that both Ms. Lance and Ms. Moran both positively identified him here in this courtroom. And then in another place during the closing argument, they say the testimony of Angela Lance by itself would be enough to convict this man. Every element of the offense was proven, every single one, by that one witness. But we went further, and Mrs. Moran also identified him. And then again, in another place in her closing, you have positive identification by two witnesses in another location. So you know not only in addition to the two positive identifications by the tellers, and they go on. And then I believe this is like the sixth time that they refer to those identifications. They say Angela Lance and Crystal Moran specifically identified the defendant as the robber, and they say specifically there was not Trevian Robinson who committed this robbery. So the effect of admitting the in-court identifications was devastating on the defense. What was their cross-examination of these witnesses by defense counsel with regard to their identity of him and how it came about? I mean, isn't that how defense counsel discovered that there had been this pretrial situation? That's correct. The reason that we may not have the vigorous cross-examination that one would expect was that going into this trial, defense counsel was under the belief that there had not been a positive identification of the defendant by anyone. And it was discovered that it wasn't until after the two bank tellers testified in court and identified the defendant that defense counsel was aware that there was going to be an identification. And the problems with those identifications weren't discovered until the cross-examination. So it came out before the jury that there had been a pretrial identification in the cross-examination? Yes. And was that argued to the jury that the witnesses were tainted because it had been suggested to them before trial that he was the bank robber? It was brought up, Judge. But I would suggest that once you place an identification before the jury, an in-court identification, and the tellers are telling the jury that's the man that robbed me, when you do that, it's tantamount to admitting a confession to the offense. Once that jury sees that, they're just not going to get it out of their minds. It's going to influence all of the evidence, the rest of the evidence that comes in. So I think that the effect that the inadmissible evidence had on the defense itself was very harmful to the defendant. Just based on that alone, we can't conclude that the inadmissible evidence did not contribute to the conviction in this case. So if we were to agree with you and remand for a new trial, tell me how the new trial would play out differently. What would happen differently at the new trial than happened at this trial? The witnesses would not be allowed to positively identify him? That is correct. They would otherwise be able to testify and show the video and the fingerprint tip and all of that other stuff is going to still come in? Yes. And you all are going to contend again that it was Robinson? Yes. And without those in-court identifications, Robinson's testimony becomes much more suspect because he's a co-conspirator. A co-conspirator's testimony is to be considered with great caution. Well, of course, he actually contends he's an innocent bystander. It's an awfully weird story that you're driving somebody to Walmart to buy groceries and he makes you park in this strange out-of-the-way place and stay in the car and all that. So, I mean, it's a weird story why Robinson isn't a co-conspirator, but he was never charged as one. He's treated as an innocent bystander, giving somebody a ride to the airport, and then they go and start trying to attack everybody at the airport. God just gave them a ride. Absolutely. And what makes his testimony much more credible, what gives it much more probative value, is the fact that you have two witnesses saying, he's the man that robbed me and then Trevian Robinson is giving this ridiculous story. It makes it more credible. That's the effect, the unconstitutional effect on the other evidence that's being produced. So you're saying by itself the Robinson story is so ridiculous it wouldn't be believed, but it's buttressed by these two ladies. That's correct. But it's also buttressed by the fingertip. Correct. Are there photos of Robinson and Schaefer in the record? There are, I believe so, Judge. How different do they appear? Oh, I'm sorry, I don't believe there are any photographs of Mr. Robinson. But he was in the courtroom, obviously. Is there any evidence comparatively how he looked different if he did from Schaefer? No, Judge. I mean, were they one taller than the other? Was there a significant weight issue between them, body? I mean, could they be distinguished? That wasn't developed in the record. The jury got to see both of them. That's our question. Yes. Is there any evidence of what the body build differences were? Other than I believe that the testimonial or the evidence was that Mr. Schaefer was more stocky and Mr. Robinson was slim. Yeah, the evidence was that Robinson was a tall, slim man and Schaefer is much stockier. But, again, if they can wear the same clothes, there's only so much difference in their build. Right. Correct. And we would ask that this court reverse the conviction, vacate the conviction and send it back. The jury can see the faces of Robinson and Schaefer in the video and decide. Well, Judge, the video is not very clear. If you look at the video, you cannot distinguish any specific facial details of the suspect that's committing the robbery. That's all. Thank you. Shirley? Shirley? May it please the court. The district court's judgment of conviction should be affirmed because even though the government has confessed error, that error is harmless beyond a reasonable doubt because the evidence in this case overwhelmingly identified Schaefer as the robber. What is overwhelming other than the fingertip evidence to me is the only, I don't know how overwhelming it is, but it's the only piece of evidence that can't be pinned on Robinson. Everything else is Robinson's clothes. They're both, you know, I mean, I get confused with pretty much every woman on the court and I don't look any like any of them. So, you know, they're similar enough that they can wear the same clothes, roughly the same age, they're cousins or something. So, I mean, there's enough similarity there that I don't think that anything's overwhelming, potentially, other than the fingertip. Your Honor, I respectfully disagree with that contention. First about the clothing, but he's wearing a sweatshirt and sweatpants. We're not talking about a size 2 sheath dress or anything like that. There can be a lot of difference in a person's weight in a sweatshirt. But if you're a lot taller or shorter than, you know, the size, it's not going to fit you right. And stocky, you know, again, elastic only stretches so much. Your Honor, with this case, the reason why there's more evidence than that, just the clothing, is because this case includes a bank surveillance video taken from 12 different cameras. And if you look specifically at clip number 4, which was the same clip that the jury looked at, the jury looked at clip number 4 on a laptop computer, which provided the clearest picture, and 20 minutes later, that jury came back with a unanimous verdict. So I would suggest that the surveillance video also clearly pegs it on Schaefer. Also, Your Honor— So are you disagreeing with counsel that says that the video was not good? Are you saying the video was good? I'm saying the video was excellent, Your Honor. Not only was it taken— I mean, is this—we're in the record. I have not actually seen the video. Would it be helpful for us to see it? Yes, Your Honor, and I would suggest looking at clip 1, clip 3, clip 4, and clip 5 out of the 12, although you can look at— I did not press it. I did not. I'm sorry. I don't want to give anybody ideas. Don't do that. Okay, but the record would also reflect that it only took the jury 20 minutes after they saw that clip to come with a unanimous verdict. Do you have Robinson in the record? Robinson, no, but on your earlier point, Your Honor, what we did do is Trevian Robinson testified during the trial, and during Trevian Robinson's testimony, we played the bank surveillance video. So what the jury could see all at the same time was Trevian Robinson on the witness stand, the bank surveillance video being played in the courtroom, and Mr. Schaffer seated at defense counsel table. So the jury had the opportunity to look at the two players as well as the bank surveillance video at the same time for an extended period. What if they looked very similar? I'm sorry, what? What if they looked very similar? They don't, and even if they did, that's where the fingerprint evidence is. Where's the evidence that they don't look similar? The evidence—the only thing that the record talks about would be their bills. However, it does not take away from the fact that Trevian Robinson testified, and the jury can make the determination for themselves because Trevian Robinson was present in the courtroom. And the fingerprint, Your Honor, would answer that additional question because in this case the United States didn't just present one fingerprint expert. We presented two fingerprint experts, and there was no cross-examination at all for the second fingerprint expert in this case, who was Mike Thomas. The only cross-examination occurred during the testimony of Marcy Farley. In addition to that, Your Honor, the evidence showed— Experts conclusively exclude, I keep forgetting his name, Robinson's fingerprints. The fingerprint experts conclusively stated that finger number nine was the— it was the tip from finger number nine that was left on the demand note. And this ties into the surveillance video. They didn't exclude Robinson. Did they take Robinson's fingerprints and exclude him? They did not take Robinson's fingerprints, Your Honor. They only looked at Schaeffer's fingerprints, and fingertip number nine was an exact match to the fingerprint tip left on the demand note. Now this is important because if you look at that surveillance video, Your Honors, particularly if you look at clip four, you'll see that the entire life of that demand note is captured on that video because it wasn't a situation where Schaeffer entered the bank already carrying a demand note. He enters the bank, and the bank teller, Angelo Lentz, gives him a withdrawal slip, which he turns around and makes a demand note. So the entire life, if you will, of that demand note is captured on camera. And the significance of that means that that fingerprint tip could only belong to the robber. It couldn't belong to anybody else. And the jury got to see that on the video as well. Was it the government's theory that Mr. Robinson was totally innocent and didn't know what was going on? I mean, did you see him as a co-conspirator that was cooperating or just a cousin who happened to drive his cousin to Walmart and had no clue what was going on until after it had occurred? I mean, is that the theory of the government, that Mr. Robinson had absolutely no knowledge of what was going on? Yeah, that's a really good question, and candidly, that's something that we kind of struggled with ourselves to try to figure out. Was Trevian Robinson a co-conspirator or an innocent bystander? That case, that answer would have been easier to come up with if Trevian Robinson drove Schaefer to a standalone bank. But the problem was, in this case, the bank is inside of a Walmart. So his story that— This is a little weird. You take me to Walmart, and please make sure and park outside of the— like, make sure you park behind this truck so no one can see your car. That isn't your typical trip to Walmart to buy, you know, Coca-Cola or whatever. I mean, I realize that it's not the same as driving up to a bank, but Walmarts have a lot of cash. So whether or not there's a bank in there, you can rob a Walmart. And it's a weird thing, in my view, if Trevian is supposed to be an innocent bystander that he's being asked to park, and then why didn't he go in with them? I mean, that's also kind of weird. Typically, you wouldn't just sit in the car forever. You'd go in there with them. So his story is weird, in my view, and does need some buttressing. And so then that raises the specter of these two positive IDs. Well, Your Honor, I don't disagree with you. It is a weird story. But there's a far difference between something being weird and us having proof that he was involved in a crime. And, unfortunately, we're stuck with weird, but we don't have a sufficient case showing Trevian Robinson's— Well, I mean, we're not here trying to convict Robinson. What we're trying to do is look at this whole issue of harmless error beyond a reasonable doubt and look at what we would have without the IDs. And, as I said, I think the story that, oh, my cousin just happened to be wearing my clothes, carrying my gun, and I drove and parked behind a truck, and I just kind of sat there listening to the birds chirp, unknowing of what's going on, is a weird story that, by itself, would not be sufficient to convict if you're using a reasonable doubt standard as a reasonable juror. I'm not saying it's insufficient evidence. I'm just saying most jurors would say, well, that story's got a lot of holes in it. Now we add the two witnesses. And your own colleague here said what really convicts him and should convince you is that both A.L. and C.M. positively identified him for you here in this courtroom, the two tellers. So why can't we hold the government to their own argument? What really convicts it? And say, well, if the government thought that and projected that to the jury, how can we find that harmless error beyond a reasonable doubt? Well, Your Honor, the government also said on page 734 that the fingerprint tip evidence in of itself alone, ladies and gentlemen, is sufficient for a conviction as well. And how do we know which one? I mean, that's the problem. Having made the argument that either one independently supports this conviction, how do we know, how can we say beyond a reasonable doubt they picked the one that's not subject to the team? Because, Your Honor, the record reflects that the jury sent two jury notes. First of all, let me backtrack for one second. This was a case with overwhelming evidence. In total, the jury only deliberated for approximately one hour and 34 minutes. Thirty-six of those minutes can be excluded because during that time, we got the first jury note where they wanted to see the video again, and then there was some back and forth in terms of which video clip to show for the jury. So in total, this jury only deliberated for an hour, and that would include, like, choosing a foreperson, you know, reading the instructions, filling out the verdict form and everything. So this is a case of overwhelming evidence, Your Honor. I'm not overwhelmed by the evidence. The only evidence is mine. Take out the identification. To me, Robinson's story has a lot of holes in it. We got the fingertip. And I'm not sure if I'm overwhelmed by the fingertip to the point of harmless or beyond a reasonable doubt. I mean, I've seen cases of overwhelming evidence. This one seems to me not to be quite so overwhelming. But it's not just the fingerprint, Your Honor, because we also provided Wal-Mart video, which placed Schaefer at the scene of the robbery, at the time of the robbery. And that Wal-Mart video has a time stamp on it, so you could literally see him exiting the car, walking up to the Wal-Mart, going down the hall, pacing up and down in front of the bank before he decides to rob it. So you have that as well. You also have Detective Jernigan, and he had identification testimony as well. He identified Schaefer as the robber. How do I find where in the record? I mean, you said Clips 1-3, but where are they in the record? What's the record site for these clips? Well, it would have been as part of our exhibits, Your Honor. Okay, and where are the exhibits in it? The exhibits were filed as part of— In hard copy, or are they on— See, we have everything on computers now, how we access the records. Something's in hard copy and not on the computer. We need to know that so we can ask the clerk's office to send it, so we don't have to send it around to the three of us and all of that. So it's a different experience than looking at the electronic record on appeal. So that's why I'm asking, literally, where is it? Well, what we did is we gave to the district court the surveillance video, which would be on a CD, and then if you open up the CD, it's going to have Clips 1-12 on it, I think under Exhibit 4. And then the hard copy would be the stills that we took from the video, just to emphasize certain events that occurred. Like, for example, one of the stills you would see— And those get filed in the electronic record, or are those in hard copy sitting at the district clerk's office and we need to go get them? I'm not 100% sure, Your Honor. I'm sorry. It's the kind of stuff y'all ought to think about, really, in this world of electronic. Okay. Because when something's in hard copy, you need to let us know that so we can get it, because we look at the electronic record and— Oh, okay. Sometimes we might go searching for something, but you see what I'm saying? This is kind of the modern world where things are electronic and we need to know if something's not. I would guess, since it's a video and the video can't really be condensed to paper, that might be in the clerk's office, but I don't really know. Okay. Where's a picture of Schaefer to compare with the video so that we'll know— We can see, yeah, we see why the jury said it was him, because we can see his face in this picture that everybody concedes is him in the video. You mean a separate picture of Schaefer? Well, how do we know it's Schaefer? How do we know that the jury, beyond reasonable doubt, concluded that the face in the video was Schaefer unless we have a visual of Schaefer that everybody agrees is Schaefer? I'm happy to supplement the record with a separate picture of Schaefer. In the record? Is that— And then what we print it out as video stills. So there's no third picture of Schaefer. That would be separate and apart from the video and the video stills. But I can supplement the record with that if you all would like. Well, if it's not from the trial court, you can. Okay, then I won't. But that's all we have, Your Honor, would be the video. The other evidence— Your argument is that the video is so clear that the jury's not looking at the paper on the stand or in the gift. Yes, it's our contention that that video is so clear and that the fingerprint evidence is clear because in this case, the fingerprint was not only verified by one person. It was actually verified by three separate people, and we brought two of those fingerprint experts to testify before the jury. I would also suggest, Your Honor, that the reason why— I would also suggest, Your Honor, that in this case, we presented nine separate witnesses, and this was a situation where none of the government's evidence was controverted or challenged. We were looking at a situation where the bank surveillance video, the fingerprint experts, the separate identification from Trevian Robinson and the separate identification from Detective Jernigan, the Walmart video, the video itself, all of this stuff was unchallenged testimony and unchallenged evidence. Were there any defense witnesses? No, Your Honor, there were no defense witnesses in this case, and I don't believe there were any defense exhibits either. All of the exhibits were from the United States. What exactly did Detective Jernigan say? Detective Jernigan was able to identify Mr. Schaefer by comparing a video still from the bank robbery to Mr. Schaefer's driver's license photo. Is the driver's license in evidence? The driver's license is not in evidence, Your Honor. And so Detective Jernigan had a separate identification testimony standing alone. This is also a case, Your Honor, that the bank teller's identification had no effect on any of the other evidence that the government had. Like, for example, the surveillance video, the bank surveillance video, or the Walmart surveillance video, that is what it is, and it has not affected in any way, shape, or form, regardless of whether or not the bank tellers can make an identification. It's stand-alone evidence in of itself. The same is true with the fingerprint evidence. That is also stand-alone evidence in of itself. So none of the evidence that we are asking you all to rely on in finding that the error was harmless beyond a reasonable doubt. If it was so overwhelming, why did the government do what it did on the improper lineup, the suggestive identification? Well, when you say the lineup, there was multiple. Well, why did they violate his constitution? You've conceded error. Yes, Your Honor. Why did the government do that, and why do we keep having to make these, well, we know the government did this wrong, did this wrong, did this wrong, we concede error, but it's harmless. Why does the government keep doing things like this? I really wish that I could tell you we didn't make the mistake, but we did. Was there any, as a collateral issue, was there any action taken against the USA who did this? I mean, this is the second time this week already we've had inappropriate conduct by U.S. attorneys in the prosecution of their cases, and we keep hearing, well, it was harmless, so it's all right, we did it, but what the heck, they're guilty anyway. So was there any action taken to correct these types of behavior on the part of the U.S. Attorney's Office? Your Honor, well, I was one of the trial attorneys. Myself and Doug Davis were on the trial attorneys, and this is something that we take very seriously. Why did you do it? It wasn't intentional, Your Honor. So what happened during the witness prep, which was the first incident of error that we corrected, was we were showing a surveillance video to refresh the witness's memory. It was the same surveillance video, the same bank surveillance video footage, and during the time, the conversation came up, and what's obvious today just wasn't obvious in the rush of preparing for trial, that by saying the name of the person in the video, I was essentially, or we were essentially equating, that's also the person that we've charged. It's obvious today it shouldn't have been done. This is like, I mean, really, if you watch television shows, you know not to do this. I mean, this just seems very basic to me. This isn't some esoteric thing that you didn't know. I mean, it's very basic that when there's a room full of people of one race and then there's only one person of the other race, you go, do you see the guy in there? I mean. Oh, okay, so you're talking about the second. Well, both of the things. I mean, to me, these are fairly fundamental sort of rookie mistakes, if you want to call them a mistake, rather than anything really esoteric or exotic. As the second, for the second event, Your Honor, that you were just talking about, typically what we do, actually, is in Houston, the U.S. Attorney's Office has a floor, has a workspace on the seventh floor. This is important because there's no district courts on the seventh floor. So typically what happens is our witnesses are sent to the seventh floor, so they're not even on the same floor as any of the district courts where any of the trials are going on, and then we text or we call someone down there to bring the witnesses up when it's time for them to testify. I don't know where the failure in the communication occurred. The record will reflect that myself and AUSA Davis were arguing at the pretrial conference. We were arguing a last-minute filed motion to dismiss, and we were also trying to get our fingerprint expert, Marcy Farley, permission to personally identify, to personally fingerprint the defendant that day. I don't know where the error, I don't know where the miscommunication occurred or why the witnesses were on the wrong floor, but it is our responsibility and we accept error for that. This was more than just bringing a witness. When you see the guy, I mean, it was more specific than that. Your Honor, I don't know exactly how that occurred. I just know what our typical procedures were and that there is a breakdown in communication. The only other thing, Your Honors, I would ask for your consideration is that this is a case that is very similar to U.S. v. Rogers, which is 126 F. 3rd 655. In that case, the bank teller provided improper identification testimony after seeing the defendant at counsel table. The court held it was harmless beyond a reasonable doubt because they relied on evidence such as finding the clothing used in the robbery, fingerprints, and that Rogers was uncooperative post-arrest. I would argue that this case is even more overwhelming evidence than the Rogers case because in this case you also have a bank video that clearly shows Schaefer committing the crime. You have a Walmart video that clearly places Schaefer at the place of the arrest at the time of the arrest. You have a separate independent identification from Detective Jernigan that is untouched, and you also have a separate independent identification from Robinson when he identified Schaefer when he saw him in the bank surveillance video. So I would say, Your Honor, that in Rogers, the court found that the error was harmless beyond a reasonable doubt. This case is like Rogers, but in this case we have even more overwhelming evidence than what the court found sufficient in the Rogers case. And I see I'm at the end of my time, so if I have no further questions, I'll yield my time to the court. Your Honor, if it may please the court, I tried this case. As I told Judge Wehrlein, as this evidence developed in cross-examination, that I would have filed a motion to suppress these in-court identifications before they were in-court identifications had the government disclosed other than what they had told me is that there was no positive identification. Why didn't you do anything to undercut the fingertip identification? I mean, this argument about we're not sure it's the same Anthony Michael Schaefer, born February 9, 1984, is ridiculous. So you didn't do anything to show that this fingertip identification is based on too few, you know, minutia points or whatever they're called. Instead, you just asked a couple questions and then in closing arguments said, Well, we don't really know. They weren't in the database. We don't really know much about this. That's not much to undercut really the only evidence you can't pin on Robinson is the fingertip. And so that seems to be the central fact of whether or not these ladies make a positive ID. You didn't do anything on that. Why not? Well, in part because they had just acquired that fingertip match, as counsel just mentioned. You didn't ask for continuance or you didn't ask for comparison to Robinson? No. The point is they never they never fingerprinted Robinson ever. And I did bring that out. He was never printed. So there was no comparison. I pointed out that there was a box of bullets found in the trunk of Robinson's car, which matched the gun. And there is a latent print on the box and they never compared it to anybody. So they didn't do any printing on Robinson. The DNA, of course, was equivocal and they didn't test the DNA from Robinson. So they avoided the whole Robinson issue by ignoring it, by not doing comparison prints, by not doing a DNA test on him to see if it maybe was him. Whether or not they could have gotten Robinson's fingerprints, it's clear that the evidence that you left pretty near unrebutted is that these two experts said this is Schaefer's fingertip. OK, that's hard to explain away for the reason that counsel said. There's a video of the of the robber. We know somebody was a robber, you know, picking up this deposit slip and so forth. So we know this is the robber's fingertip. And lo and behold, it's Schaefer's. What did you do to undercut that and how? Why should we send this back for a new trial only to have this same fingertip be the deciding point? And we've wasted everybody's time. Well, well, one, wasting time is not not the standard if we have. Actually, it is because harmless error beyond a reasonable doubt would say it's a waste of time to retry this. So why isn't it a waste of time given this fingertip that you didn't do anything to undercut? Well, because I do not believe that that fingerprint was so overwhelming in and of itself. It's a fingertip, the finger, the fingerprints that were rolled and tested four times. It took his prints four times. No match. And in cross examination, when we were talking about what are the points of identification for this fingertip? They couldn't tell us. They couldn't tell us the points of similarity or the points of difference. Because they weren't any more prepared for that than anybody else. They had just taken that print. So we don't have this kind of masterful, excellent scientific evidence on fingerprints that says, yes, we've got 45 points of comparison. And then they put them up in front of the jury for the jury to see. They didn't even have the fingerprint card and evidence that was used for the comparison. So that's brought out as a weakness in their case. So this is not the kind of overwhelming idea of the matching fingerprint and the forensic expert who ties it all together like that, as you suggest it might be. So that's not really what happened in the course of this trial. You started saying you were going to file a motion to suppress the in-court identification. You did not, or did you? No. When I approached the bench to argue for the mistrial because we had been presented with this. When was the first time you found out about this? In the cross-examination of those witnesses was the first time it was disclosed that, one, they had been shown photographs and told who Mr. Schaefer was. And then with the second witness, we learned that they'd actually been brought to the courtroom, opened the door. So did you cross-examine them over this in front of the jury, that they had actually been, Mr. Schaefer had been pointed out to them? Yes, because that was the only way to develop the record so that you would have a... And did you argue that to the jury, that these people might have been, their identity might have been tainted because they had been shown and suggested to them that he was a bank robber ahead of time? I did not because that is the legal argument. And that's why I moved for the mistrial during the trial once this happened. But that... Isn't that also the factual argument? If I show you a picture of somebody 10 times and I say, that's the guy, then you're going to identify that as the guy even if that's not really your actual memory from the event. I mean, you can make that argument. I could if I had, if I'd known about it in time to bring an expert on eyewitness identification to talk about all the facts. What did you just say? You know, if I say that, people understand that. It's not that far off in the realm of... I agree it'd be nicer to have an expert. Yeah. But the fact is it's not that far off the ordinary person's experience that people can have suggestions made to them and buy into that suggestion. Well, in the cross-examination, one of the police officers, the one who went beyond eyewitness and said, no, it's inherently unreliable. And we talked about that in front of the jury, that eyewitness identification is inherently unreliable. And that's why they do more. If we go back and look at these stills and the clips the government says we should look at and it turns out they're clear, what arguments did you make to the jury that, look how similar Schaeffer and Robinson physically appear, facial, body build, everything else? The arguments I made are essentially the ones that you pointed out, that I believe Traven is a bit more slender than my client was, but it's his clothes, it's his gun. I mean, is there anything in the record that says one is X inches taller or X pounds bigger? No. No, there is nothing like that. Are their facial features different? Are they different? Arguably, if you stood them next to each other, yes. But can you tell that from the video? I don't think the video is clear enough. I would submit it's not. But then in the courtroom, the jury saw the video with Robinson on the stand. Is it clear enough that the jury could decide it's Schaeffer and not Robinson? In the absence of the positive identifications by the two robbers, I think so. What was the, I don't know what's in the record, but what was the race of the two eyewitnesses? They're white. So you've got cross- The defendant was African American? He was black, so it's cross-racial identification. It's the whole bundle of problems, that's why it's constitutional error. And the government's conceded that. The question is, can they clean the taint? I submit they cannot. And as a result, we didn't get the fair trial we were entitled to. Okay. Thank you, Mr. Berg. Thank you.